## ESTATE OF SOLOMON LEVIS, DECEASED.

APPEAL BY ELIZABETH HAWKINS FROM THE ORPHANS' COURT OF MONTGOMERY COUNTY.

| 140 | 179 |
|-----|-----|
| 203 | 416 |

| 140 | 179 |
|-----|-----|
| 33 SC | 534 |

Argued February 6, 1891—Decided February 16, 1891.

When the testimony, submitted on an application for an issue devisavit vel non, showed that, although the testator was an habitual drunkard, yet, when he made his will he was entirely sober, possessed testamentary capacity, and there was no evidence that he was subject to undue influence, it was not error to refuse an issue.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 75 January Term 1891, Sup. Ct.; court below, No. 78 June Term 1890, C. P.

On September 1, 1890, in the matter of the appeal of Elizabeth Hawkins, niece of Solomon Levis, deceased, from the decree of the register of wills admitting to probate the alleged will of said deceased, a petition was filed praying for an issue devisavit vel non, with an agreement to submit the question upon all the testimony taken on the hearing had before the register of wills.

After argument, the court, SWARTZ, P. J., on October 6, 1890, filed an opinion as follows:

Solomon Levis died testate in June, 1889. He made his will February 21, 1887. His estate is estimated to be worth between thirteen and fourteen thousand dollars. By this will he gives $5,000 to his friend Judson J. Clayton, $2,000 to his cousin Helen D. Lloyd, and the residue to his niece, Elizabeth Hawkins, wife of William Hawkins. The testator was a bachelor, and Mrs. Hawkins, the residuary legatee, was his only near relative. She contested the probate of the will, upon the ground that the testator was not of sound memory and understanding, and upon the further ground that the legacy to Judson J. Clayton was obtained by undue influence. The register decided against the contestant, and she now asks this court to

award an issue to determine the question raised in that contest.

In early life, the testator was addicted to drink. This was a family weakness. His two brothers, Paul and Marshall, lived very intemperate lives. The testator reformed, and for almost seventeen years abstained from intoxicating drinks. He and his brothers lived near the hotel of C. S. Clayton, the father of Judson, the legatee, and during this period of abstinence he expressed great antipathy against this hotel and the persons there and elsewhere engaged in the sale of intoxicating liquor. In August, 1885, he returned to his old habit, and continued therein to his death. In January, 1886, he made his home at the Clayton hotel, and lived there continuously, with the exception of a short time spent in the city of Philadelphia.

On his return from that city to the Clayton hotel he was taken with delirium tremens. His sickness continued for about six weeks, and during this period he was nursed by Judson, the legatee. He continued his excessive drinking, spending his money freely at the Clayton bar. He engaged in no business; sat in the bar-room or remained about the premises. He was furnished with liquor over the bar, from day to day. From these indulgences he was very often drunk, and at such times he was wild and very profane. Drink did not readily affect his locomotion, but made him loud and boisterous. Drink impaired his health, and, no doubt, to some extent impaired his mental power. When sober he was always rational and competent to transact business. He was a man of considerable intelligence.

His money, save that received from the estate of his brother Paul, was safely invested in securities, the interest of which was payable semi-annually in Philadelphia. Paul's estate was not distributed until the spring of 1887; that is, subsequent to the time Solomon Levis, the testator, made his will. From the spring of 1887 to the time of his death the testator spent all the current income from his Philadelphia securities, together with almost four thousand dollars of his share in the distribution of the estate of his brother Paul.

After making his home at the hotel, he soon manifested strong friendship for Judson J. Clayton. He declared to

others that Judson had shown great kindness to him. When the will was drawn he told the scrivener that Judson had been very good to him, took good care of him, and was the only friend that cared anything for him. Judson usually served out the drink to him, gave him liquor at intervals, ranging from one half hour to two hours, and stopped the drink on him when he thought Levis had enough. Judson accompanied him when he went to Philadelphia to collect his interest. Sometimes the testator gave his money to Judson to keep for him, and when money was needed to pay outside bills Judson would hand the money to the testator.

While at the hotel the testator expressed great dislike to William Hawkins, the husband of the contestant, giving as a reason for this feeling, that William married her for her money. Mrs. Hawkins was educated by her uncle, the testator. He made her presents before marriage, and also some few after marriage, but none within the last ten years. He never visited her at her home after her marriage, which occurred about fifteen years ago. Mrs. Hawkins testifies that her uncle declared to her that Mr. Clayton, the father of Judson, told him that William married her for her money.

When Mr. Levis came to the Clayton hotel, he brought his papers with him and placed them in the custody of the elder Clayton. Mr. Clayton died in November, 1887. His widow then conducted the business for a short time. The property was sold, Judson becoming the purchaser and proprietor of the hotel.

Judson, at the request of the testator, took him to Mr. Hunter for the purpose of having a will prepared. In the presence of Judson, the testator gave the scrivener the directions and provisions of the will. He was sober, and the will, when finished, was read over to him in detail. When Mr. Levis gave directions for the $5,000 legacy he turned to Judson and asked him whether that was not what he promised him. Judson answered that it was, and that whatever he did was satisfactory to him ; to which the testator replied that when he said a thing he generally tried to carry it out. Two years and four months after the will was executed Mr. Levis died. Death was caused, or at least hastened, by the continuous excessive use of stimulants.

Does the testimony laid before us disclose a material dispute? The test to be applied is, would the trial judge, after a careful review of all the testimony, feel constrained to set aside a verdict against the proponents of the will, obtained upon a fair and impartial trial, as contrary to the manifest weight of the evidence: Graham's App., 61 Pa. 43; Knauss's App., 114 Pa. 10.

There is clearly no evidence upon which to sustain a finding that the testator was not of sound memory and understanding when the will was made. Some of the witnesses show that the mental faculties of the testator were more or less impaired by his indulgences. This is not sufficient to establish testamentary incapacity. If his mind and memory were sufficiently sound to enable him to know and to understand the business in which he was engaged at the time he executed the will, this is all that is requisite, although the memory may be imperfect and greatly impaired by age or disease: Wilson v. Mitchell, 101 Pa. 495. The evidence is uncontradicted that the testator was sober when he made the will. That he had sufficient mental capacity to make a will when in a sober condition, cannot be questioned, under the evidence laid before us.

We do not understand that the contestant rests her case upon mental unsoundness, except so far as it may become an important element in considering the question of undue influence. In passing upon a question of undue influence, the strength and condition of the mind may become a proper, indeed an essential subject of inquiry; for, although weakness, when arising from age, infirmity or other cause, may not be sufficient to create testamentary incapacity, it may, nevertheless, form favorable conditions for the exercise of undue influence: Herster v. Herster, 122 Pa. 252.

The evidence discloses no proof of any direct undue influence. There is no evidence of any undue solicitations, artifice, fraud, threats, imposition, or bad faith, on the part of the legatee; no effort to bias the mind of the testator against the contestant or her family. True, the testator declared that the legatee's father told him that contestant's husband married her for her money, but this was a declaration of the testator and cannot be received as evidence of the fact: Herster v. Herster, supra. Undue influence, to avoid the will, must destroy the

free agency of the testator at the time and in the very act of making the testament; it must be a present constraining influence operative at the time the will is made: Eckert v. Flowry, 43 Pa. 46; Trost v. Dingler, 118 Pa. 259.

But, it is argued that the undue influence arises from the confidential relation existing between the testator and the legatee, and from the unlawful relation between the testator, a slave to drink, and the legatee, the person who unlawfully furnished the drink. It is contended that the evidence establishes the existence of these relations, and that they constitute a circumstance of proof which must be submitted to a jury. How is this confidential relation shown?

It appears that Judson was in the habit of accompanying Levis in his visits to Philadelphia to collect interest; that at times Levis handed the interest to Judson, who then furnished money to the testator when he desired to pay outside bills. There is no evidence that the testator consulted Judson in any business matter, or that he asked or received Judson's advice. The testator's investments, purchases and gifts, were made without any suggestion from Judson. Mr. Morrison made the investment that is spoken of in the evidence; he also prepared the papers in the gift to the Friends' School. Mr. Morrison was also the custodian of four thousand dollars, which were paid out from time to time to the testator personally or upon his order. It is even doubtful whether any of the Philadelphia income was handed to Judson prior to the time the will was made. We must remember that the elder Clayton, who died in November, 1887, had the Levis papers, and this income was not sufficient to pay the debts contracted at the hotel; for the evidence shows that due-bills were held by the elder Clayton, at the time the will was executed, and these were subsequently paid by Mr. Morrison out of the testator's share in the estate of his brother Paul. If Judson afterwards became the custodian of any of testator's funds this fact could not have operated upon the testator's mind when the will was drawn, for then the fact had no existence and cannot be used as a factor to show a confidential relation at the time the will was executed. The attendance of Judson upon Levis, in the Philadelphia visits, indicates, as disclosed by the evidence, no more than a desire upon the part of the testator to protect himself against his own known weakness.

The evidence of an existing confidential relation is certainly insufficient to establish such relation. But, suppose the evidence does establish it, the same evidence also discloses that the will was the free and intelligent act of the testator. The will was not drawn by the legatee, or by his direction or procurement. The testator made application to the scrivener some months before, to have a will drawn. He was taken to Mr. Hunter, at his own request, and gave minute directions from which the draft was made. He discussed with the scrivener matters pertaining to his property, and when the will was written it was read over to him in detail. The legacy to Judson was a specific sum, not the residue or any part of it. There is no evidence upon which to base an argument that the testator did not fully comprehend the extent and character of the bequest he was making. The legatee was present, but took no part in the preparation of the will, except to answer a question put to him by the testator. In this reply he said whatever the testator did was satisfactory to him. Levis was nursed by Judson and seemed to recognize that he was indebted for the kindness shown him. He frequently declared that he would or had remembered the legatee in his will. His niece was his only near relative, and it is evident that he did not take very kindly to her husband, for he never visited her at her home, although he showed the kindest interest in her before her marriage. She had some means of her own, a fact upon which the testator commented.

Even where the will is drawn by a confidential adviser, who is made the principal legatee, such will is not to be overthrown where it is clear that the person executing it was of sound mind and understood its contents and was not unduly influenced : Yardley v. Cuthbertson, 108 Pa. 415. The acts of confidential agency relied upon, may all be classed under the head of kindness ; but general kindness, unless it be shown to be part of a crafty arrangement to procure a testamentary disposition, is no evidence of undue influence : Tawney v. Long, 76 Pa. 115 ; Trost v. Dingler, 118 Pa. 259. The existence of a fiduciary relationship does not annul the testamentary act in favor of the attorney, even where he draws the will, but such fact calls for watchfulness lest improper influence may have been exercised. And when in such case, there is no evidence

or fact indicating undue influence the court should refuse an issue: Harrison's App., 100 Pa. 458. If the testator and legatee stood in a confidential relation, we find nothing in the evidence to show that Judson Clayton abused the relation by any act, direct or indirect, showing undue influence.

Lastly; was there an unlawful relation which operated upon the mind of the testator in favor of the legatee? We were much impressed with the forcible argument made by the counsel for the contestant, upon this question. That Judson Clayton violated the law daily, in selling liquor to a man of known intemperate habits cannot be denied. The sales were made wilfully, and were therefore violations of the law even prior to the act of May 13, 1887.

The natural and ordinary influence of an unlawful relation must be unlawful so far as it affects testamentary disposition favorable to the unlawful relation and unfavorable to the lawful heirs: Dean v. Negley, 41 Pa. 318. Proof of an unlawful relation is therefore insufficient unless such relation affects testamentary disposition.

Does the unlawful sale of liquor to an intemperate man constitute an unlawful relation between the seller and the purchaser affecting testamentary disposition? If this is an unlawful relation in the contemplation of law affecting testamentary disposition, it can only arise where the testator is, to a certain degree at least, dependent upon the legatee for his drink. From such a dependency, the legatee may have acquired an undue influence over the testator. And yet such fact seems to us to establish no more than the existence of a favorable condition for the exercise of undue influence, similar to that condition which exists where there is mental weakness from age, infirmity, or other cause; and, in such case, an issue is not awarded without some evidence that the will is not the free and independent act of the testator, and, as we already attempted to show, there is no such evidence in this case. There is no evidence that the legatee took advantage of this condition to unduly influence the testator in his behalf. But, we think the evidence fails to establish this dependency upon the legatee for drink. The elder Clayton was the proprietor of the hotel when the will was made. The legatee was the bartender. The proprietor was at least equally responsible for

the illegal sales. The testator was not dependent upon the legatee alone for his drink.

It may be said that the unlawful relation between the elder Clayton and the testator, may defeat a legacy to the son, under the ruling in Dean v. Negley, supra. But, the answer to it all is, that the testator was not dependent upon this hotel for his liquor. This is shown by the fact that for a time he went to Philadelphia and there indulged so freely that he had to be removed. Upon said removal he was taken with delirium tremens, as the result of these excessive indulgences. The change to Clayton's seems to have acted as a check. He had the full control of his estate, could go when he pleased or remain. If refused liquor, he could go elsewhere to procure it. A man without means seems to be able to secure enough liquor to lead a drunkard's life, and a man with a large estate in his full control is sure to have no difficulty in obtaining all the liquor he can drink. If he cannot walk to bring it, money will bring him both messengers and stimulants. This may be a sad commentary upon the observance of the liquor laws, but our observation tells us it is true.

We conclude that the evidence does not justify the awarding of an issue to the Common Pleas. The appeal is dismissed and the issue is refused; exception.

—Thereupon, the petitioner took this appeal, assigning the refusal to grant an issue as prayed for, for error.

*Mr. Montgomery Evans* (with him *Mr. Louis M. Childs*), for the appellant.

Counsel cited: Boyd v. Boyd, 66 Pa. 283; Cuthbertson's App., 97 Pa. 163; Wilson's App., 99 Pa. 545; Yardley v. Cuthbertson, 108 Pa. 395; Wilson v. Mitchell, 101 Pa. 495; Reichenbach v. Ruddach, 127 Pa. 593; Herster v. Herster, 122 Pa. 259; Rea's Est., 11 W. N. 79; Thompson v. Kyner, 65 Pa. 380; Dean v. Negley, 41 Pa. 312.

*Mr. N. H. Larzelere* and *Mr. M. M. Gibson*, for the appellee, were not heard.

In the brief filed, other than cases cited for the petitioner, counsel cited: Harrison's App., 100 Pa. 458; Trost v. Dingler, 118 Pa. 259; Cauffman v. Long, 82 Pa. 72.

PER CURIAM:

It does not follow that because a man is a drunkard he cannot make a will. This testator, for anything that appears, was entirely sober when he made his will, and possessed testamentary capacity. Nor is there sufficient evidence to submit to a jury that his will was the result of undue influence. The court below was right in refusing an issue.

　　　　　　　　Decree affirmed, and appeal dismissed at the costs of the appellant.