| 203 | 400 |
| 208 | 415 |
| 208 | ⁶422 |
| 208 | ²428 |
| 208 | 429 |
| 203 | 400 |
| 213 | ⁶ 13 |
| 203 | 400 |
| 33 SC | ¹534 |
| 33 SC | ⁴539 |
| 33 SC | ⁴540 |

# Robinson, Appellant, v. Robinson.*

*Wills—Issue devisavit vel non—Effect of judgment on verdict against will.*

Where on an issue devisavit vel non, a judgment has been entered on a verdict against the will, there is a judicial determination by the trial judge independent of the finding of the jury, that the verdict ought to stand. In such a case the jury is not alone responsible, the court also is responsible; and if after the case has been fully developed, the court, in view of the whole evidence, considers it not sufficient to sustain the material facts, it is bound to set aside the verdict. The result of this is that in order to reverse such a judgment, the laboring oar is on the appellant in a stronger sense than is commonly applicable to a disappointed suitor.

*Will—Undue influence—Evidence as to weakness of mind.*

Although a jury may find affirmatively by its verdict that testamentary capacity existed, yet on the issue of undue influence it may consider evidence tending to show weakness of mind with relation to the management of testator's business and estate.

Weakness of mind short of testamentary incapacity, as a basis for the exercise of undue influence by another, may be shown by any lawful evidence, direct or indirect, tending to establish the fact.

---

* Owing to my being of counsel, the report of this case was prepared by Albert B. Weimer Esq., Assistant State Reporter.—Wm. I. Schaffer, State Reporter.

*Will—Undue influence—Definition of undue influence.*

Undue influence of the kind which will affect the provisions of a testament must be such as subjugates the mind of testatrix to the will of the person operating upon it; and in order to establish this, proof must be made of some fraud practiced, some threats or misrepresentations made, some undue flattery, or some physical or moral coercion employed, so as to destroy the free agency of the testatrix, and these influences must be proved to have operated as a present constraint at the very time of making the will. The jury may conclude that they did so operate if they are proven to have operated upon the testator in all the important business affairs of life down to a time close to the making of the testament.

General evidence of power over the testator, especially if he be of comparatively weak mind, from age or bodily infirmity, though not to such an extent as to destroy testamentary capacity, will be enough to raise a presumption which ought to be met and overcome before a will can be established. Particularly, ought this to be the rule when the party to be benefited stands in a confidential relation with the testator.

*Will—Undue influence—Charge of court.*

On the trial of an issue devisavit vel non where a will made by a mother in favor of a son is attacked, the court properly states the law in charging as follows: " A son may importune his mother to make a will in his favor. He has a perfect right to do it, and if the only effect was to move her affections or sense of duty or judgment, he has a perfect right to do it; but if these importunities were such as the testator had not the power to resist, and yielded for the sake of peace and quiet, or escaping from serious distress of mind, if they were carried to a degree by which the free play of testator's judgment, or discretion, or wishes were overcome, it is undue influence. He can coax her, but he must not drive her, either by moral coercion or physical force."

*Will—Undue influence—Evidence—Declarations of testatrix.*

Delarations of a testatrix offered as tending to show her mental weakness, and that the will was procured by the undue influence of her son, are admissible in connection with other evidence to establish the fact of undue influence.

*Will—Undue influence—Declarations of principal beneficiary.*

Declarations of the principal beneficiary under a will are admissible, not for the purpose of proving testamentary incapacity, but to prove a confidential relation between himself and testatrix, collusion between himself and her agents to procure her to make a will, and by the course of business between them extending over years, the subserviency of a weak mind to a stronger one.

*Will—Issue devisavit vel non—Charge—Harmless error.*

In a will contest where the issues framed are whether the signature was the signature of the testatrix, whether the paper was executed by testatrix and whether the paper was executed under undue influence, and it appears that the paper showed both a signature and a mark, and the court

decides from the uncontradicted testimony that the mark was made by the testatrix and submits to the jury to determine whether the name on the paper was the genuine signature of the testatrix independent of the mark, and the jury find in favor of proponent on the first two issues and against him on the third, the proponent is not harmed by the action of the court and cannot complain that the court's instructions as to the mark and the genuineness of the signature are inconsistent.

*Will—Issue devisavit vel non—Undue influence—Sufficiency of evidence—Question for jury.*

On the trial of an issue devisavit vel non where the proponent, a son of the testatrix, and the principal beneficiary under the alleged will, is charged with having procured the execution of the will in his favor by undue influence, the testimony of the contestants, to some extent contradicted, tended to show that testatrix for a period of about twenty years before her death had made her home with her son ; that during the eleven years preceding her death she had expended $300,000 of her estate, and that she had bequeathed, apart from some jewelry and household articles, the entire balance of her estate, worth about $200,000 to her son. At the time of her death her son was her only surviving child. Three children of a deceased son survived her and were the contestants. Twenty-four years before the death of testatrix she had, at the instance of her son, placed the property which she then owned in trust. The son testified that he had urged his mother to create this trust because he discovered that she had been by improvident expenditures denuding herself of her property. After testatrix took up her home with her son their incomes went into a common purse, and although her separate income was paid regularly, no separate account was kept of it. About eleven years before her death her brother died, leaving to her a very large amount of property. This property was in another city, and managed for her by agents. Soon after the death of her brother testatrix gave her son, proponent, a power of attorney to transact her business. The son then assumed the entire control of her income, raised money on mortgages, and rendered his mother no written account. He secured the money by time and sight drafts on his mother's agents, and both the son and the agents apparently combined to keep from her information as to the condition of her estate. She was frequently in want of comparatively small amounts of money necessary to her comfort, and made demands for the same which were not always met. She complained to several people of her son's extravagance, and threatened more than once to revoke the power of attorney, but this she never did. The evidence for the contestants tended to show that this condition of affairs continued down close to the execution of her will which was made ten days before her death. About fourteen months before her death testatrix and her son went to the city where her property was situated for the purpose of making her will. Proponent testified that at the hotel where they stopped he noted down for his mother the disposition to make of her property, that he then had the draft typewritten, took it back and read it to his mother, that he then made some

1902.]                    Syllabus—Statement of Facts.

corrections of it in his own hand, again read it over to her, and she expressed herself as satisfied, and that he then left the paper with her. The following morning this draft was taken by some one to the office of the agents of testatrix, and on the same day was sent by them to a lawyer, not known to testatrix, who drafted from the notes substantially the will in controversy, except that in the draft made at the hotel there was a bequest of $25,000 to one of the granddaughters which did not appear in the will. In the following month this paper was mailed to the son at his home, and three months thereafter the son mailed the copy back to the agents telling them that his mother desired certain alterations. The lawyer who originally drafted the paper made another copy, and mailed it to testatrix who received it about ten months before her death. Nothing seems to have been further known of the paper until the tenth day before testatrix died, when the testatrix while in bed directed her son to take it from her bureau drawer. The evidence showed that the paper then bore the signature of testatrix but not witnessed. At the suggestion of her son and his partner, both lawyers, testatrix made her mark to the paper which was witnessd by the son's partner and another person. At the time testatrix made her mark, the son had withdrawn from the room, but was within hearing distance. Before he left the room, however, the son read a part of the will to his mother, and distinctly called her attention to the fact that he was the principal beneficiary in it. After the mark was made, the son took possession of the paper and locked it up in his office safe. There was evidence that the granddaughter referred to in the draft had been given $50,000 by an earlier will. It also appeared that in the will in controversy an annuity had been provided for a son who died eight months before testatrix, and for whose funeral testatrix had paid. A number of witnesses testified that testatrix had expressed an intention to die intestate saying that her own fortnne had come that way, and that would make her grandchildren equal. *Held*, that the evidence of undue influence was sufficient to submit to the jury, and that a verdict and judgment against the will should be sustained.

MITCHELL, J., dissents.

Argued March 18, 1902. Appeal, No. 16, Jan. T., 1902, by plaintiff, from judgment of C. P. Delaware Co., March T., 1901, No. 210, on verdict for defendants, in case of John B. Robinson and A. Welling Wyckoff, Executors of Letitia Robinson, Deceased, *v.* Anna R. Robinson and Gerald O'H. Robinson and William J. McClure, Guardian of Mary Parker Robinson. Before MITCHELL, DEAN, BROWN, MESTREZAT and POTTER, JJ. Affirmed.

Issue devisavit vel non. Before JOHNSON, P. J.
The issues framed were as follows:

1. Whether the signature to said paper writing is the signature of the said Letitia Robinson.

2. Whether the said paper writing was executed by the said Letitia Robinson.

3. Whether the said Letitia Robinson was of sound and well-disposing mind, memory and understanding at the time the said paper writing is alleged to have been executed by her.

4. If the said paper writing were executed by her, the said Letitia Robinson, whether the execution thereof was procured by duress, imposition, and undue influence exercised over the mind of said deceased.

5. Whether the said alleged will was procured by undue influence of John B. Robinson.

The court admitted under objection and exception declarations of John B. Robinson, the principal beneficiary.

The court also admitted under objection and exception declarations of the testatrix, relating to the management of her estate by her son.

The court also admitted under objection and exception evidence of testatrix's weakness of mind as affecting the question of undue influence.

The court also admitted under objection and exception a large number of papers relating to the management of the estate of testatrix.

Plaintiff presented these points:

1. There is no evidence in this cause, which can in law impeach the genuineness of the signature of Letitia Robinson to the will, and the verdict of the jury, upon the first question of the issue, must be in favor of the plaintiffs. *Answer :* We answer that this is affirmed, so far as it relates to the mark. As it relates to the signature, it is a question for the jury.

2. There is no evidence in this cause which the law can recognize as proof that the will was not executed by Letitia Robinson, and the verdict of the jury upon the second question of the issue must be in favor of the plaintiffs. *Answer :* That is affirmed.

3. There is no evidence in this cause which the law can recognize as proof that the will was not executed by Letitia Robinson, and the verdict of the jury upon the second question of the issue must be in favor of the plaintiffs. *Answer:* We

say to you when she signed that mark, that there is evidence sufficient to say to you that it was executed by her. The evidence will be for you whether she understood it, and whether or not she was unduly influenced.

4. There is no evidence in the cause which would warrant the jury in finding that the testatrix was not of sound and well-disposing mind, memory and understanding at the time of the execution of the will, and the verdict of the jury upon the third question of the issue must be in favor of the plaintiffs. *Answer:* That point is affirmed. There is no evidence in this cause upon which the court would sustain a verdict against the will for want of testamentary capacity. Therefore, we affirm that point. But the question of the condition of her mind, however, enters into the consideration upon the other questions which we have submitted to you.

5. There is no evidence in the cause which would warrant the jury in finding that the execution of the will was procured by duress, imposition and undue influence exercised over the mind of the testatrix, and upon the fourth question of the issue the verdict must be in favor of the plaintiffs. *Answer:* That is refused. That is a question for you, whether or not this will was procured by duress, imposition and undue influence exercised over the mind of the testatrix, and the whole question turns upon that. It is the great issue—did she understand, was she unduly influenced?

6. There is no evidence in the cause which would warrant the jury in finding that the will of the decedent was procured by undue influence of John B. Robinson, and the verdict of the jury upon the fifth question of the issue must be in favor of the plaintiffs. *Answer:* That is refused. It is a question for you whether or not this will was procured by the undue influence of John B. Robinson, and you will apply the testimony in the cause to that question as I have heretofore laid it down.

7. The court is asked to define undue influence to the jury, and to distinguish it from the lawful influence which a son may properly exercise over the mind of his mother in procuring a will in his favor.

The Court: Is it counsel's desire to have that definition read again to the jury?

Mr. Broomall. Yes.

*Answer :* This is a prayer to the court to define to the jury undue influence. Undue influence is the use by one in whom a confidence is reposed by another who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage of his weakness of mind or of his necessities or distress, or to constrain him to do that which he would not have done without the exercise of such control. It is that influence which compels one to do that which is against his will from fear, the desire of peace, or some feeling which is tantamount to force or fear. Undue influence does not necessarily involve physical force or violence. It implies something more than mere advice, argument and persuasion. Advice, argument, and persuasion, if they convince the reason and move the affections only, leaving the will free and unfettered, are not undue influence. But even advice, argument and persuasion, if they be so importunate and persistent and so operate as to subdue and subordinate the will of the testator to the will of another, till the testamentary instrument speaks not his own mind and his own purpose, but the wish and purpose of another, such advice, argument and persuasion, so operating and with such effect are undue influence. To be undue influence the influence must at least amount to moral coercion. But if it amounts to moral coercion it is undue influence, no matter how or by what instrumentalities produced. A son may ask a mother to make a will in his favor, may persuade her to do so, may be importunate in his persuasion, and if the effect of such persuasion is such as only to move the affections, sense of duty or judgment, it is not undue influence, but if the persuasion was so importunate or persistent, and so operated as to amount to moral coercion and to subdue and subordinate the will of the mother to his will, and this coercion operated at the time of the testamentary act, it would be undue influence.

This undue influence must operate at the time of the testamentary act. It may have been exerted before, but it must be in operation at the time of the testamentary act, and must destroy the free will of the testator. It is not, however, necessary that the jury should know what particular agencies were employed to overcome the free will of the testator, and while you cannot find this fact of undue influence upon mere suspi-

cion or surmise, it is not necessary that you be able to lay your finger on any particular act of undue influence exerted over the testatrix. It is enough if, upon all the evidence, you are convinced that the paper does not speak the true and voluntary purpose of the maker. It is not necessary that the fact of undue influence be proved by direct evidence, but it may be proved by circumstances. From the surroundings of the testator, the character of the will, the family relations, the conditions of the health and mind of the testator, his dependency upon and subjection to the control of the person supposed to have wielded the influence, the opportunity and disposition of that person to wield it, the acts and declarations of such person, the connection of the person wielding that influence with the preparation, making, or execution of the will.

8. All influence arising from the relationship of mother and son are lawful and proper, and it is even lawful and proper for a son to importunately persuade his mother to make a will in his favor. *Answer:* This point is affirmed, with the exception that importunity such as the testatrix had not the courage or ability to resist, or carried to the degree in which the free agency of the testatrix is destroyed, will constitute undue influence. Importunity less than that is lawful.

9. Undue influence consists of threats, violence, circumvention or fraud, exercised over the mind of the decedent in the preparation and execution of the will, by which the decedent was coerced or misled into doing what she did not desire to do. *Answer:* This point is affirmed, to which we may add the definition given to you in the answer to the seventh point, which we have just read to you at length.

Defendants presented these points:

1. In order to make a valid will the law requires that the testator shall be of sound and disposing mind, memory and understanding, and that he shall have a full and intelligent knowledge and understanding of the act in which he is engaged; shall have a full knowledge of the property he possesses; an intelligent perception and understanding of the disposition he desires to make of it and of the persons and objects he desires shall be the recipients of his bounty, and if, therefore, the jury find that Letitia Robinson at the time of the making of this alleged will did not have these legal requirements, then the

verdict should be against the will and in favor of the defendants. *Answer:* That is affirmed. That is the law.

2. The law also requires that in order to make a valid will the testatrix shall be free from any undue influence over her mind resulting in the execution of the alleged will, and this undue influence may be shown by all the facts and circumstances surrounding the testatrix, the nature of the will, her family relations, the condition of her estate, the condition of her health and mind, her dependency upon and subjection to the control of the person supposed to have wielded the influence, his opportunity and disposition to wield it, and by his acts and declarations. *Answer:* That is affirmed.

3. Even if the jury should find that Letitia Robinson gave instructions at the hotel in Pittsburg for the preparation of a will, yet if the paper produced differs materially from the instructions then given, the jury must be satisfied that the changes were made with her full knowledge and consent and that the paper as produced fully embodied her wishes, otherwise the verdict should be against the will and for the defendants. *Answer:* That is affirmed. That is the law.

4. If the jury find that John B. Robinson, the chief beneficiary under this alleged will, occupied towards his mother, the testatrix, at the time of the making of the said will, the confidential relation of her attorney at law as well as her attorney in fact, and as such controlled and managed her estate, and that he concealed from the testatrix the actual condition of her estate, and that if by reason of this confidential relation his influence over his mother was such as to deprive her of her free agency, and this condition existed at the time of the making of this alleged will, and the said will was the result of this influence, then the verdict should be against the will and in favor of the defendants. *Answer:* That is affirmed, gentlemen, if you find that this influence was undue and that it destroyed her free agency at the time of the execution of the will.

5. The fact that under the terms of the will in controversy all of the natural heirs of the testatrix save John B. Robinson, the chief beneficiary, are practically disinherited in favor of John B. Robinson, may be taken into consideration by the jury together with the other evidence in the case as showing the exercise of undue influence on the part of John B. Robinson.

*Answer:* We answer to that point—we cannot say that it is a fact that under the terms of the will all the natural heirs of the testatrix save John B. Robinson, the chief beneficiary, are practically disinherited. If, however, you find that to be the fact, then you may take this fact into consideration, with the other evidence in the case, in passing upon the question of undue influence.

6. If the jury shall find from the testimony that for many years prior to her death, Letitia Robinson lived in the house of John B. Robinson; that he and those under his influence had control of and managed her affairs ; that she was eighty-four years of age at the time she executed the alleged will and had the bodily infirmities incident to such age ; that John B. Robinson was instrumental in giving instructions from which the will in dispute was drawn and that he was practically the sole beneficiary under the will, then it is incumbent upon him to show affirmatively in this suit that Letitia Robinson, with respect to the paper in dispute, had advice independent of any from John B. Robinson, or those under his control, and that she also had a full knowledge and understanding of the effect of the paper which she is alleged to have executed. If this is not found by you, the verdict should be against the will and for the defendants. *Answer:* We cannot affirm this point as it is written. If John B. Robinson was a stranger to her blood, and not a natural object of her bounty, this point would be affirmed. However, if you shall find from the evidence that for many years prior to her death Letitia Robinson lived in the house of John B. Robinson, and that he and those under his influence had control of and managed her affairs, that she was advanced in years at the time she executed the will, that John B. Robinson was instrumental in giving instruction from which the will was drawn, and that he was practically the sole beneficiary—if you find these facts you may take them into consideration, in connection with the other evidence in the cause, in passing upon the question of undue influence. In other words, we say that the burden is not upon Mr. Robinson, that it is upon the other side.

8. If the jury find that Letitia Robinson had not a full knowledge of the effect of the will and of the condition of her estate, and that in consequence the will was not her free and

voluntary act, the verdict should be for the defendants. *Answer :* That is affirmed.

10. Unless Letitia Robinson had full knowledge of the contents and effect of the paper produced as her last will and testament, and freely and voluntarily executed it as such, the verdict should be for the defendants, and whilst the knowledge of the contents of a paper may be presumed from its containing the signature of the party to be bound by it (it being presumed that it would not be signed without a full knowledge of its contents), this presumption should not arise where the alleged signature is that of a person enfeebled by age or bodily sickness, except where the existence of the signature is free from all suspicion of fraud and overreaching, and with full opportunity to become acquainted with the contents. *Answer :* We say this point is affirmed to the extent that the testatrix must have had a full knowledge of the contents and effects of the paper and freely and voluntarily executed it. We cannot say that the failure to show that the existence of the signature is free from all suspicion of fraud, etc., changes the presumption.

11. If the jury find that the testamentary dispositions of the alleged will are unnatural or unjust, that circumstance is entitled to great weight in determining whether or not undue influence was exerted. *Answer :* If the jury find that the testamentary dispositions of the will are unnatural and unjust, that circumstance may be taken into consideration by the jury, with the other evidence in the cause, in passing upon the question of undue influence. It will be for the jury to say whether from the provisions of the will there is any inference of undue influence and the weight to be given to such inferences. The court cannot say what weight shall be given to them. They are for the jury.

Verdict for plaintiff on the first three issues and for the defendant on the fourth and fifth issues. Plaintiff appealed.

*Errors assigned* were various rulings on evidence and various instructions.

*William B. Broomall* and *William I. Schaffer*, for appellant.—There was no proof of any influence, either directly or

circumstantially, exerted upon the mind of the testatrix by John B. Robinson or by any other person in the preparation and execution of the will: Boyse v. Rossborough, 6 H. L. Cas. 48; Tawney v. Long, 76 Pa. 106; Dean v. Negley, 41 Pa. 312; Yorke's Est., 185 Pa. 61; Wainwright's App., 89 Pa. 220; Eckert v. Flowry, 43 Pa. 46; McMahon v. Ryan, 20 Pa. 329; Thompson v. Kyner, 65 Pa. 368; Trost v. Dingler, 118 Pa. 259; Miles v. Treanor, 194 Pa. 430; Logan's Est., 195 Pa. 282; Englert v. Englert, 198 Pa. 326; Friend's Est., 198 Pa. 363; In re Kaufman, 117 Cal. 288 (49 Pac. Repr. 192).

The interests of legatees under a will are several and not joint. The declarations of one legatee under a will are not admissible to affect the validity of the will: Morris v. Stokes, 21 Ga. 552; Nussear v. Arnold, 13 S. & R. 323; Clark v. Morrison, 25 Pa. 453; Irwin v. West, 81* Pa. 157; Shaver v. McCarthy, 110 Pa. 348; Yorke's Est., 185 Pa. 67; Schierbaum v. Schemme, 157 Missouri, 1 (57 S. W. Repr. 526).

The declarations of Letitia Robinson which were admitted in this case were not admitted as physical symptoms to show a condition of mind. They did not relate to a condition of mind. They were admitted solely as proof of the facts declared by them.

So far from these declarations tending to show a condition of weakness or plasticity of mind they, in fact, established the reverse,—that she was a woman of strong, resolute and vigorous mind.

It is a travesty of justice for a litigant to be permitted to introduce evidence of declarations in an issue of this kind under the guise of proving weakness of mind, and then make use of the declarations which in reality show strength of mind for the purpose of establishing the facts declared: 2 Redfield on Wills (4th ed.), 541.

After proof of the due execution of a will, declarations by the testator at a time so remote from that of the execution as not to constitute part of the res gestæ are not admissible to affect the validity of the will: Harrison's App., 100 Pa. 467; Herster v. Herster, 122 Pa. 239; Swope v. Donnelly, 190 Pa. 417.

The finding that testatrix signed the will is a finding that

she knew and understood all of its provisions: Hoshauer v. Hoshauer, 26 Pa. 404; Vernon v. Kirk, 30 Pa. 218; Combs' & Hankinson's Appeal, 105 Pa. 155; Dickinson v. Dickinson, 61 Pa. 401; Linton's Appeal, 104 Pa. 228.

Neither her oral declarations nor the declarations of any of the persons present could affect its validity: Grubbs v. McDonald, 91 Pa. 236.

*V. Gilpin Robinson*, with him *Canfield & Shay, Lewis H. Van Dusen* and *Horace P. Green*, for appellees.—While an unnatural will is not in itself evidence of undue influence, yet in connection with other facts and circumstances from which undue influence may be inferred, it is evidence: Patterson v. Patterson, 6 S. & R. 55.

As used in the law of wills, undue influence has been defined as " that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist."

Statements made by testator on prior occasions as to his testamentary intentions in the disposition of his property are relevant, as showing his purposes and state of mind when the will was made, if such statements are consistent with the provisions of the will, they tend to rebut charges of undue influence, otherwise to confirm them. But statements of the testator to show the fact of undue influence are not relevant: Neel v. Potter, 40 Pa. 483; Blume v. Hartman, 115 Pa. 39, 40; Herster v. Herster, 122 Pa. 239.

So subsequent statements or acts may be shown which indicate the state of mind when the will was made: Rambler v. Tryon, 7 S. & R. 94; Chess v. Chess, 1 Penrose & Watts, 32; McTaggart v. Thompson, 14 Pa. 154; Herster v. Herster, 122 Pa. 255.

The declarations of testator as to her intent to revoke the letter of attorney were admissible: Herster v. Herster, 122 Pa. 256; McTaggart v. Thompson, 14 Pa. 154.

The burden was upon John B. Robinson to show that the will was the free and voluntary act of Letitia Robinson: Miller v. Miller, 187 Pa. 572.

As bearing upon the question of undue influence, the jury are entitled to consider whether the will is natural or unnatural:

Patterson v. Patterson, 6 S. & R. 55 ; Baker v. Lewis, 4 Rawle, 357 ; Robins v. Kitchen, 8 Watts, 390 ; Herster v. Herster, 122 Pa. 260.

OPINION BY MR. JUSTICE DEAN, October 13, 1902 :

Letitia Robinson died November 23, 1900, in her eighty-fourth year. She had been confined to her bed by a severe illness for about three weeks before her death ; on the 13th of the same month, ten days before her death, she made her will, the writing in dispute. She was the widow of William O. Robinson, a lawyer of Allegheny county, Pennsylvania, who had died many years before, leaving her with five sons, William, James, Alexander, John and Eccles, to survive. Up to the date of the will, all had died except John B., this plaintiff. Of the other sons, Eccles alone left children, these three contestants, Anna R., Gerald O. and Mary P. Robinson. Eccles married twice ; Gerald O. and Anna R. are children of the first wife ; Mary Parker is a child of the second wife ; the mother died when the daughter was an infant, and she was taken by her uncle John B. and reared as one of his family. Some years after her husband's death, the testatrix, Letitia Robinson, continued to live in Pittsburg, but in 1879, she went to her son, John B., at Media, and made her home with him until her death, a period of about twenty years. Her husband had left her property of the value of about $100,000. On January 10, 1876, she conveyed the whole of her estate to George W. Guthrie in trust for herself during life. In this conveyance she was joined by her son John B., who added to the trust as a further provision for his mother, property to the value of about $10,000. In February, 1889, her brother Eccles Robinson died, leaving her an estate worth over $400,000. In the eleven years following, up to the date of her death, she expended, approximately, $300,000 of her estate, but that part of the property coming to her from her brother Eccles, much of which was real estate in the city of Pittsburg, had largely appreciated in value after she took possession. By her will, with the exception of some jewelry and household articles, the entire residue of her estate, approximately worth $200,000, was devised and bequeathed to her son John B. She had made provision in the will for a monthly payment of $125 to her son James during

his life, but as he died eight months before her, the property which secured the monthly payment fell into and became part of the residuary estate devised to her son John B.

On December 12, following her death, the will was tendered for registry before the register of wills; this was met by a caveat, filed by contestants against probate. After a lengthy preliminary hearing in the orphans' court, that court certified the case to the common pleas for an issue, which court, after further hearing, directed an issue devisavit vel non. The questions framed to be submitted to the jury were these:

1. Whether the signature to the said paper writing is the signature of said Letitia Robinson?

2. Whether the said paper writing was executed by said Letitia Robinson?

3. Whether the said Letitia Robinson was of sound and well-disposing mind, memory and understanding at the time said paper writing is alleged to have been executed by her?

4. If the said paper writing were executed by her, the said Letitia Robinson, whether the execution thereof was procured by duress, imposition and undue influence, exercised over the mind of said decedent?

5. Whether the said will was procured by the undue influence of John B. Robinson?

It was ordered, that the parties to the issue should be John B. Robinson, who sought to probate the will, plaintiff, and Anna R. Robinson, Gerald O. Robinson and Mary Parker Robinson, the latter represented by her guardian, William J. Mc-Clure, defendants. The cause came on for trial on October 19, 1901, when a jury was sworn. The plaintiff, having called Charles H. Thomas and T. Speer Dickson, the subscribing witnesses to the will, who testified to the execution of it by the testatrix and the circumstances attending the execution, read the will and rested his case in chief; the defendants then adduced evidence, tending to negative the first three interrogatories and to affirm the last two; the plaintiff then by evidence undertook to rebut defendant's averments. The trial lasted about four weeks. At the close of the evidence the court, peremptorily, instructed the jury to answer the second and third interrogatories "Yes"; as to the first he instructed them to find, that testatrix made her mark to the will; as to whether

she also affixed her signature he left that as a question of fact
to them.   To understand this last instruction, it should be
noticed, that the signature was "Letitia $\overset{\text{mark}}{\underset{\text{her}}{\times}}$ Robinson."   The
two subscribing witnesses testified, they saw her make the
mark ; there was conflicting evidence as to whether the name
" Letitia Robinson " had been written by her; it was not writ-
ten in the presence of the subscribing witnesses.   As to the
last two interrogatories, the court submitted to the jury the
conflicting evidence bearing on them.   The jury found for
plaintiff on the first three and for defendants on the last two ;
that is, they found, that the signature was that of the testa-
trix ; that she executed the will, and that at the time she was
of sound and disposing mind, but that John B. Robinson had
procured the will to be made by undue influence.   There was
no motion for a new trial and the court entered judgment on
the verdict; plaintiff now appeals, preferring 583 assignments
of error.   Many of them are trivial, suggesting no error worth
discussing ; many others are repetitions of the same averment
in a different form of expression.   We shall endeavor, first, to
state the controlling principles applicable to the issue on the
evidence before us and then to pass more particularly, on such
of the assignments, as seem to us, to require special notice.

The verdict here was against the will and the court entered
judgment upon it.   To reverse this judgment, in a stronger
sense than is commonly applicable to a disappointed suitor, the
laboring oar is on appellant; for under the 41st section of the
act of March 15, 1832, directing the issue, there is in effect,
an approval of the verdict by the court.   Here the learned
trial judge after the testimony taken before the orphans' court
and after a further hearing before him, directed and framed
the issue, then, after a prolonged hearing of all the evidence
on both sides with the parties and witnesses before him, he
enters the judgment, which appellants now argue, should be
reversed, because the evidence to sustain it is insufficient.
" The issue is of right when the fact arising and in dispute is
substantial, unless the whole evidence of the fact be so doubt-
ful and unsatisfactory, that a verdict against the validity of
the will ought not to be allowed to stand: "   Schwilke's Ap-
peal, 100 Pa. 631.   Again in Wainwright's Appeal, 89 Pa.

220, " If upon the whole evidence such a verdict (against the will) ought not to be allowed to stand, an issue ought not to be awarded." Then further, " The test to be applied is, would the trial judge, after a careful review of all the testimony, feel constrained to set aside a verdict against the proponents of the will, obtained upon a fair and impartial trial as contrary to the manifest weight of the evidence:" Graham's Appeal, 61 Pa. 43 ; Knauss's Appeal, 114 Pa. 10 ; Levis's Estate, 140 Pa. 179. To the same effect are a large number of other authorities. The orphans' courts of the commonwealth are especially bound to discourage litigation of this kind unless based on credible evidence of material facts, by refusing an issue. And even where an issue is granted, if after the case has been fully developed, the court, in view of the whole evidence, considers it not sufficient to sustain the material facts, it is bound to set aside the verdict. There is here then, in effect, a judicial determination by the trial judge, independent of the finding of the jury, that this verdict ought to stand. We usually say, that a mistake in judgment on the evidence by the jury cannot be reached in a court of review, but in the case before us, under the settled law, the jury is not alone responsible ; the court also was mistaken in its judgment on the evidence if the jury was mistaken.

Leaving out of view for the present those assignments of error, to particular rulings on the admission of or rejection of evidence, we will consider the first two propositions of appellant's counsel, viz: that there is no sufficient evidence that any undue influence was exercised on the mind of testatrix by anybody when she executed the will; and second, there is no sufficient evidence that John B. Robinson unduly influenced his mother to make a will in his favor.

In support of the first proposition, it is earnestly argued that the judgment on the third interrogatory of the issue conclusively establishes that at the time the will was made testatrix " was of sound and well-disposing mind, memory and understanding." This being taken as a fact, then in the absence of any direct evidence of fraud or duress, the conclusive presumption is, that in law and in fact, the writing is her will.

There is no doubt that evidence to establish undue influence over an intelligent mind, firm in its purposes, must be clear and

positive in its character, as distinguished from vague and doubt-
ful testimony or uncertain inferences.   As is said in Cuthbert-
son's Appeal, 97 Pa. 163, "Where, however, the charge is,
that undue influence was exerted upon a mind healthy, strong
and free, nothing short of direct proof will avail, and it must
be clear and convincing."   And the same in substance is said
in Tawney v. Long, 76 Pa. 106, and in Logan's Estate, 195 Pa.
282.   But this verdict does not establish any such high degree
of mental capacity as is referred to in these cases ; it was not
the duty of the jury to specify the degree of mind ; testa-
mentary capacity or incapacity was what was submitted to
them to find, and the court instructed them to adopt the usual
legal phraseology indicating testamentary capacity only.   So
that on the subject of undue influence, the question of whether
the testamentary mind of testatrix was of that kind which made
it peculiarly susceptible to influence, still remained open as an
element of fact on which evidence, direct or inferential, could
properly be adduced to aid the jury in their answers to the
fourth and fifth interrogatories.   We think, therefore, that as-
suming testamentary capacity to have existed, as the verdict
established it, it was perfectly proper for the court to admit
the evidence offered tending to show weakness of mind with
relation to the management of her business and estate.   If she
could be easily persuaded against her interest in money mat-
ters, easily controlled and managed by others stronger minded,
and more selfish and sordid than herself, although in her social,
domestic and religious affairs her intellect was up to the aver-
age, still, evidence of weakness of mind in the transaction of
business and care of her estate was admissible.   And this is in
substance the ruling of all the authorities, including those cited
by counsel for appellant, Yorke's Estate, 185 Pa. 61, Logan's
Estate, 195 Pa. 282, and Harrison's Appeal, 100 Pa. 458.   In
fact, we have not been able to find a single case in which,
when merely testamentary capacity was established, weakness of
mind short of testamentary incapacity as a basis for the exer-
cise of undue influence by another, was not also permitted to
be shown, by any lawful evidence, direct or indirect, tending
to establish the fact.

From the course of the trial in the court below we do not
see that the question, as to on which party rested the bur-

den of proof, is now important. Plaintiff produced the writing, then called the subscribing witnesses who proved its execution; the court permitted the paper to be read; plaintiff then rested; contestants then proceeded with their evidence tending to show that the will was procured by the undue influence of John B. Robinson, the principal beneficiary; plaintiff then fully replied, and all the evidence having any bearing on the issue was before the court and jury. Contestants, when plaintiff rested his case, might have argued, whether successfully or not we do not decide, that the proof of execution was insufficient, that the principal beneficiary had produced the writing to testatrix and assisted in the execution of it, and that there was no sufficient evidence that she knew its contents, therefore, they might have moved for a verdict in their favor; it would have then been our duty to decide whether plaintiff had made out, prima facie, such a case as cast the burden of proof on defendants; but they did not do this; they at once attacked the will and sought to overthrow it by evidence tending to show it had been procured by the undue influence of John B. Robinson. Whether at that stage of the trial the burden was on them or not, they chose to assume it; we will not decide whether what they picked up and carried was their load or not, but will treat any defects in the proof of execution, so far as they have any bearing in defendant's favor on the question of undue influence, as evidence vindicating the judgment, for it will be noticed that after the whole evidence was in, the case, in many respects, was very different from that which it presented when plaintiff first rested; then, John B. Robinson's evidence, when called on his own side, taking up 132 pages of printed testimony, affirmatively, as to proof of the execution of the will, and explanatory of his incidental connection therewith, was not before the jury; after that, it was no longer a case solely for the court, but for the jury on the whole of the evidence.

Was there sufficient evidence to warrant a finding, that the will was procured by the undue influence of John B. Robinson? In this case as in Cuthbertson's Appeal, 97 Pa. 163, Wilson v. Mitchell, 101 Pa. 495, and other cases, the evidence of feebleness of mind is so blended, with that tending to show undue influence, that in some instances it is difficult to separate them.

In 1875 testatrix was a widow living in Pittsburg ; the plaintiff was in the naval service in the China seas ; in the following year he returned and visited his mother at Pittsburg ; soon after, at his request, she made a deed of trust to George W. Guthrie of the property left by her husband, valued at his death at about $100,000, in which trust the son included about $10,000 of his own property ; the trust secured a life estate to the mother with remainder at her death and the death of her other sons, to John B. Plaintiff himself testifies, that he urged his mother to create this trust, because he discovered that she had been by improvident expenditures, denuding herself of her property. Therefore, it is argued, it is not an unreasonable inference, that at this early period she lacked that business ability and strength of mind necessary to guard her against imposition. It is to be noted, she was at that time only fifty-nine years of age ; if then improvident and too easily persuaded, this weakness would probably become more pronounced as she grew older, in the remaining twenty-four years of her life. The defendants then offered evidence tending to show that from that time down to her death, her incompetency continued. In 1879 she took up her home with her son in Media ; their incomes went into a " common purse," although her separate income was paid regularly ; no separate account was kept of it. In February, 1889, her brother Eccles Robinson died leaving her property in real estate and cash amounting to over $400,000 ; part of the trust estate given her by her husband still remained, how much does not clearly appear, for part had been sold and there was on it a mortgage of $20,000. Afterwards, Guthrie resigned, and by proper proceedings Motheral and Lea were appointed trustees ; soon after the death of her brother Eccles, she gave her son a power of attorney to transact her business ; as nearly as we can gather from the testimony, during the following eleven years of her life her whole annual gross income was about $25,000 ; her debts at her death in mortgages and other claims for loans and bills amounted to about $275,000, the income and money borrowed making a total of about $500,000, much of which passed into and through the hands of the son individually or as her attorney in fact ; during these years the mother kept no account whatever, not even a bank account ; her son rendered no written accounts to her for he kept none ; he kept

at times an individual bank account and one as attorney in fact, subject to his draft, but most of the money from her estate during the latter years of her life was realized from his sight and time drafts on Motheral and Lea, the agents for the estate at Pittsburg. Their accounts showed the amounts they paid out. It is argued that these methods of receiving and disbursing these large amounts of her money, at the rate of $50,000 a year, by her son and agents, disclose an almost childish weakness on her part and make plain a persistent dominance of her mind by the son in all affairs relating to her property.

We cannot unduly prolong this opinion by pointing out piece by piece all the testimony exhibiting the kind of management of this large estate by her son, the attorney in fact, and the agents at Pittsburg, Motheral and Lea. Any one who patiently wades through the 1,300 pages of printed testimony in the appendix cannot fail to come to the conclusion, that the management at " both ends of the line," as they termed Media and Pittsburg, was utterly lacking in business system or method; it exhibits all the reckless devices and shifts of those in continual financial straits, even to what is called in street slang, the " kiting " of checks between the attorney in fact at the one end of the line and the agents at the other. Practically, the business was known only to the agents. .

The Pittsburg agents testify, that they mailed to her monthly or quarterly accounts; if they did, she either did not get them or did not read them, for the correspondence before us, some 350 letters and telegrams passing between the agents at the two points, clearly establishes, that while the son knew the condition of the estate, the mother did not know or did not comprehend it; time and again she wanted an auditing or accounting; she made frequent demands for the comparatively small amounts of money necessary to her comfort, which an aged woman in her station in life, with her estate, had a right to expect and she was disappointed. For example, note this extract from a letter of the son August 31, 1899, to the agents at Pittsburg : " Mother is complaining about a matter which I think you could easily obviate; she says that when Mr. Lea was here, he promised she would not have to wait or wire for money any more, but that he would see it was remitted to her; now why not do this, I do not mean large amounts. She would be satisfied with

much smaller sums if they were remitted from time to time. Why not send her a check or a draft this week that way? It would obviate her going to persons here when I am away or wiring you or writing, and she is greatly pleased to get the letter and money though small."

The reason the money was not sent, will be noted in this reply of Motheral and Lea to John B. Robinson the next day: " If you will just look over the accounts and notice the number of drafts you draw on us it will not be difficult for you to see why we are unable to send your mother any money. We cannot now, we are going to help Moses in our present financial condition." Clearly, she believed she had money and had a right to a small remittance; just as clearly, both her attorney and agents withheld from her the reason her demand was denied; then the son suggests, that she be quieted by small sums from time to time in which the agents seem to have concurred. On April 14, 1900, the son asks the agents to borrow for a short time $250 and remit to his mother, as she cannot understand why there is not enough to supply her wants at any time. Two days after, on the 16th, the agents remitted the money without intimating it was borrowed, although they had written the son only a few days before that his mother's account was overdrawn $3,800.

Further, there is a letter from the Pittsburg agents to the son January 30, 1900, which gives a long schedule of drafts for comparatively small amounts, either due or about to become due amounting to several thousand dollars saying, among other things: " We have no money and have advanced a great deal more than we can stand so we must get it back. . . . Mr. Slack mailed you the will, you had better have it executed. Is there not some scheme you can suggest to get these taxes up? The Penna. Co. is threatening foreclosure." The very same day they write this brief note to the mother: " We inclose herewith our accounts rents showing balance $1,741.77 due us, and for which we will take credit in next account. We also inclose authorization slips for transfers. Please sign and return to us immediately." The reasonable inference the mother would draw from the note was, that her estate was indebted to her agents the comparatively small sum of $1,741.77, which they would deduct from next monthly account, yet the son was in-

debted to them on accepted drafts on the estate $5,000 or $6,000 to which, that very day they had emphatically called his attention. Then the next day, the 31st, they write to the son this note: " You had better send us a judgment note of your mother for $2,850 to pay the 1897 taxes. We will endeavor to negotiate same. Probably you had better send us also, several notes to cover the 1898 taxes, $8,132.58, in amounts of $2,500. We will do our best to get the cash on them." It will be noticed, that in the note to the mother there is not a hint of back taxes past due from two or three years of $11,000, or the son's overdrafts of several thousand more making altogether probably $15,000. The agents at neither end of the line gave her the information it was their plain duty to give. It was not remarkable, that the mother did not understand why her small remittances out of a $25,000 rent roll did not come promptly to hand. At times, she had a vague apprehension, that through her son's and perhaps her own extravagance, her large estate was slipping away from her, and she so expressed herself frequently to others and complained to them of her son; when told by reputable persons that she could stop it by taking away from him all power ever her affairs, she said she would do so but did nothing. This is by no means inexplicable. She was not of strong mind; nearly all her children were dead; she was old; if she took such radical action with this son, who treated the estate as his own, and perhaps thought it was, it probably meant a breaking of her home ties, a severance of relations with her remaining kindred; the thought of this to a woman of her age and growing physical infirmities would be unendurable and she submitted. These are examples out of many, of the sort of control exercised over her and her affairs by her son and her agents from 1896 to the day of her death. What owner of a large estate of average intellectual capacity would have submitted to such dominance of her affairs, unless it had been brought about and kept up by the design and superior will of others?

That she was restive under this bondage, yet too weak to break from it, there is testimony of quite a number of witnesses. Horace R. Manley a conveyancer, had drawn a power of attorney for her to her son in 1881, by instructions from the mother communicated to him by the son; this power she executed; within eighteen months afterwards, she came back and com-

plained to him of the manner in which her son was mismanaging
her property and seemed to be worried; he told her she could
at once get rid of this trouble by breaking the power of attorney;
she said she would, but, so far as he knew, did not.   To a neigh-
bor, Margaret Leedom, with whom she often talked about her
affairs, she complained of the unnecessary and lavish way in
which her son was using her money, that it would not last during
her old age, that she would be reduced to poverty; she was always
going to stop him but never did.   To another, J. D. Ivison,
the proprietor of the hotel where she stayed with her son and
his family, she complained, that the son's checks to her were
not cashed, because he had no money in the bank.   Her com-
plainants of his conduct were frequent during the three years
preceding 1893.   To another, Joseph Chadwick, editor of a
newspaper in Media, she frequently came to borrow a Pitts-
burg paper, saying, that at home they hid the papers away from
her; before 1889, but while the Guthrie trust was in force she
told him her son had secured possession of her estate by a power
of attorney while she was sick, and by threats of violence; he
advised her to write to her attorney at Pittsburg; she said her
son would not mail the letter; he told her to bring it to him
and he would mail it; this she did and he mailed it; then about
the year 1897 she talked to him about making her will, said
her mail had been tampered with in correspondence with Mrs.
Odessa Robinson the mother of two of contestants; these talks
or complaints were twenty or thirty in number.   To another,
George Newman, who was in the employ of the son in 1896 and
1897, she frequently talked and complained of her son squander-
ing her money and expressed fears that none would be left for
her grandchildren; that the son instructed him not to give her
any letters from Motheral and Lea that came for her in the mail;
that she gave him telegrams addressed to Motheral and Lea in
the presence of the son, and the son would tell him to take
them to the telegraph office, but before that, had instructed him,
to only to pretend to do so, and if she afterwards asked him if
he had sent them to say " Yes "; that once she wanted the son
to do something to which he objected and her son swore at her.
Heard her say once, that if she was able to attend to her own
business she would see that it was managed differently.   Wil-
liam R. Newbold, of the banking firm of Hoopes and Newbold,

with whom an account was kept by the son amounting to many thousands of dollars running from March 4, 1889, soon after her brother's death, to June 27, 1892, testifies, that probably on three or four occasions, the mother called to know how her son's account stood; he declined to answer except in presence of her son; then on informing the son of his mother's inquiries, the son instructed him to not give her information except when he the son was present, that he would tell her all she wanted to know. To a number of witnesses she expressed an intention to die intestate. Said her own fortune had come in that way and that would make her grandchildren equal.

There was much other evidence of a like character, from all of which contestants argue, that it was a reasonable inference, that the mother was of a weak mind, was dominated by the son's stronger will; that her mind rose to no higher degree of strength, than the mere expression of wishes, which when the son disregarded or denied, she submitted, and he thus subjected her will to his, took possession of her estate, disbursed and disposed of it as he chose.

It is argued by appellants' counsel, that this evidence is too remote to warrant a reasonable inference of the son's influence being in operation at the time the will was executed. That even if it should show, that in the years previous to 1900 the son induced or persuaded his mother to do that which was in opposition to her wishes, the question still is, was she of disposing mind and memory when she signed the writing in dispute, and was the act then, without unlawful constraint on the part of the son? All the authorities cited by counsel for appellant hold this to be settled law and we neither question nor desire to question it. But while the facts narrated as to the size and disbursement of the estate and the testimony of witnesses as to complaints of testatrix and conduct of the son cover years, they come down close to the preparation and execution of the will. The feebleness of mind which made her susceptible to undue influence had existence in 1876. If it had arisen from illness, or other cause temporary in its nature, the presumption would be, that the end of the cause was the end of the weakness; but the evidence tends to show, this streak of mental infirmity was inherent, commencing, probably, with her birth and continuing with constantly increasing mani-

festations through old age until death. A long chain of circumstances running through many years point to the conclusion, that hers was a mind easily controlled as to business matters, quickly diverted from its purposes, and not difficult to subject to the stronger will of another. Appellant's counsel state a long series of facts separately and ask, is any one of the facts sufficient to prove mental weakness or undue influence? We answer no, not one of them; but taking them all together, their continuity, the character of them, extending over many years, they pointed to a weak, irresolute mind readily susceptible to the influence, whether lawful or unlawful of a stronger one. Her frequent complaints to many reputable persons outside her own family, when taken in connection with the lavish expenditures which at fitful intervals she seems to have vaguely comprehended, show this with striking significance. As is said in McTaggart v. Thompson, 14 Pa. 149, "Nothing can indicate more clearly weakness of mind, than complaining of that which he can so easily remedy by burning the will." The testatrix could have, at any time, revoked the power of attorney; at any time have dismissed her agents and transferred their duties to another. In Rambler v. Tryon, 7 S. & R. 90, also a will case, the testator complained to others, that "his wife and father plagued him to go to Lebanon; that they wanted him to give her all or he would have no rest; that he did not want to go to Lebanon." This complaint was held to have been properly admitted as evidence of weakness of mind and undue influence. That which unlawfully thwarts the wishes of weak minds, only prompts complaints; the same thing arouses strong minds to action, and they effectively put an end to any interference with their purposes by getting rid of the offender.

This brings us to the evidence connected with the execution of the will. John B. Robinson testifies that a will was prepared in 1891, but he believes that one was destroyed; that sometime earlier than July, 1899, there was talk between him and his mother of a will, and she said she would go to Pittsburg and arrange her affairs there and make a will; that he went to Pittsburg with her in September for that purpose; when they got to Pittsburg he went to her room at the Monongahela house and noted down for her the disposition she intended to make of her property; that he thinks he then took

the rough draft made by him downstairs and had it typewritten; then he took it back and read it over to her; then made some corrections of it in his own hand, again read it over to her and she expressed herself as satisfied, and that he then left the paper with her; the next he heard of it was on October 22, following, when Motheral and Lea mailed to him a copy of a will drawn by Mr. Slack, an attorney in Pittsburg, saying, "We inclose herewith copy of will as per your copy," meaning the copy prepared in his mother's room; that he had seen no paper relating to the will from the time he left the copy with his mother in her room at Pittsburg, until he received by mail the copy from Motheral and Lea a month afterwards; that he delivered the copy so received to his mother who had then returned home; then he heard nothing further until January 24, 1900, about three months after he had given it to her, when she brought it to him and said she wanted some alterations, immaterial ones, made, specifying them; he then mailed the copy with the alterations noted, to Motheral and Lea, to have a corrected draft of it made; that he never saw his mother's will from that day until November 13 following, a period of about nine months; on that day she was sick in bed, having been ill for a week; before breakfast of that morning he went into her room; she said, "I have a paper in the bureau drawer I want fixed up," that he went to the drawer, took out the paper, looked over it and said, "This is your will, mother. Is this the paper you want witnessed?" She said it was. "Get Mr. Dickson and have it attended to." About ten o'clock he telephoned Mr. Dickson that his mother wanted to see him; Dickson came and they both went upstairs to his mother's room; that he went to the drawer, got the paper and handed it to Dickson; that either before or after he handed it to Dickson he explained it to his mother; that he read some of it and explained its provisions, but did not read the whole of it; that he said to her; "You must understand, mother, this will give James what you arranged for in Pittsburg and leaves the rest of the estate to me,—the whole of it. Understand what you are doing in this matter. This gives me the estate;" and she said "Yes," and he went out of the room, but not so far away as not to be within hearing of what was going on; that the will had been signed with the proper name of his mother when he first saw it that morning;

but that Mr. Dickson held the pen for his mother and she also put her mark; that his mother asked Dickson if it was all right and he answered it was. Charles H. Thomas, the first subscribing witness, had lived in the family for eleven years, and knew testatrix well, was called to the room by Mr. Dickson; Mr. Robinson went to the drawer and got the paper, and went over the contents to his mother; then handed the paper to Mr. Dickson, and he said, " Is that all right, grandmother? " and she said " Yes; " then she. made her mark; he thinks something was said about her signature, and it was said her mark. would answer, as her signature was already there; he believed that at the time she was in full possession of her faculties. T. Speer Dickson, the other subscribing witness, was a lawyer and partner of John B. Robinson; he did not appear at the trial but his testimony at the hearing before the orphans' court was read from the stenographic notes then taken; he says he went to the room of testatrix; that her son produced the will; that witness then went to her and said he was there to witness her will and she assented; that when he opened the paper he noticed it had been signed by her; he thought it was necessary she should make her mark as it had already been signed, and he suggested that her mark be made; that he took the pen and with both his and her hand on it she made her mark; after that was done, she took him by the hand and said, " Now, Mr. Dickson, it is all right, is it? " And he told her it was all right; his inference was, that as she wanted to make a will, she wanted to know if that was it and it was all right. He said he never read the will at any time and was ignorant of its contents until after her death. May Disert, the nurse of testatrix, was in the room all of the time, testified to, and says Mrs. Robinson, though very feeble physically was mentally bright; that she heard the son say, " Mother, here is your will," that he then read portions of it to her, and she nodded her assent; that this was all the knowledge witness had of the will; that she remembers beside the bequest of personal property to the children, a portion of the estate was set aside to the widow of one of the sons to be paid monthly, and that in response to a question of Mr. Dickson, she said she was perfectly satisfied.

It would be a waste of time to discuss the point made by

contestant's counsel, that the evidence fails to show a lawful execution of the writing as a will.   All the statute requires is, that it shall be signed at the end thereof and this may be, either by writing the proper name, or by making a mark or cross, and the signature shall be proved by two witnesses.   The jury has found, that the signature was that of Letitia Robinson, and that it was put there by her, and further, that at the time she possessed testamentary capacity ; the judgment on the verdict in these particulars, has not been appealed from by contestants, therefore, it is fruitless to discuss them.   But as before remarked, in so far as the evidence bearing on the preparation and execution of the will tends to show mental weakness, an inability to resist persistent importunity or to assert her own will power concerning the disposition of her property, the evidence is proper for consideration, and to that extent only, we notice it.

The testimony of John B. Robinson shows, that he talked with his mother concerning the making of her will not later than the July preceding ; he wrote to Motheral and Lea, that she was going to Pittsburg to make her will ; he went to Pittsburg with her for that purpose and then with her to her room at the hotel where a rough draft was made by him in her presence.; this he took out and had typewritten and brought it back to her room where he left it.   The next morning it was taken by some one to the office of Motheral and Lea and the same day by one of the firm, probably Mr. Lea, to the office of Mr. Slack, their lawyer ; he had before that time transacted some legal business for John B. and was known to him.   Mr. Slack dictated to his typewriter from the notes or rough draft of the will made at the hotel, substantially the will read in evidence, except in the draft made in Mrs. Robinson's room there was a bequest of $25,000 to Mary Parker Robinson, which does not appear in the will now before us.   Mr. Slack testifies, he sent the copy drawn by him to Motheral and Lea and they testify it was mailed by them to John B. Robinson on October 23, 1899.   On January 24, 1900, John B. Robinson remailed the copy to Motheral and Lea, in which he said his mother desired certain alterations ; they delivered the paper to Mr. Slack with the suggested alterations ; he made another copy and mailed it to Mrs. Robinson

at Media without letter or instructions; that copy is the one now produced as her last will. It must have reached Media about the first week in February, 1900. So far as appears, nothing further is known concerning it until the morning of November 13, the same day it was executed, when as John B. Robinson testifies, she directed him to take it from her bureau drawer. Testatrix did not know Mr. Slack and never saw him; no communication passed between them; he was the regular attorney of Motheral and Lea. They were very desirous that she should make a will. As early as April, 1900, Mr. Lea, after consultation with his partner, Mr. Motheral, thought it best for them that she should make a will; in that month he called upon her in Media, and urged her to make one. He says their firm had indorsed Mrs. Robinson's paper to the amount of $20,000 and it was for the purpose of avoiding complications and delay, that they desired a will and the appointment of executors. In what way a will would relieve the settlement of the estate from complications is not clear to us; a will could neither help nor hinder the payment of their debt; no will can affect the right of a creditor to be paid first: Blake's App., 134 Pa. 240. But whatever the motive, Lea testifies that he went to Media and verbally urged her to make a will; that is something, he says, he would not have written to her about, and gives no reason, yet whatever it was, it did not restrain him from writing on January 30, 1900, to the son, saying: "Mr. Slack mailed you the will, you had better have it executed." Motheral and Lea also had interviews with her at Pittsburg and both talked with her concerning the preparation of the will. Although she remained there six weeks the will was not submitted to her for approval; it was not until after she returned home that the paper came into her hands from her son; then the son remailed it to Pittsburg with alterations for a new draft of it; this was made and returned to her by mail without letter or instructions, the date blank and a blank space for the appointment of an additional executor.

The fact that first attracts notice is, that in the rough draft prepared and approved by her in her room at Pittsburg was a bequest of $25,000 to Mary Parker Robinson; this was in the rough draft first delivered to Mr. Slack, which is the foundation of the will before us; certainly Mr. Slack, who never saw or

spoke to Mrs. Robinson did not leave it out of his own motion; Mr. Motheral testifies it was in the notes made from the instructions given by her in her room; nothing approaching proof is given, to satisfactorily account for the disappearance of this bequest.   Mary Parker Robinson was a special object of testatrix's love and affection; more than once she declared her intention to provide for this child; in the will of 1891, which had been canceled, she was given $50,000; there is a reasonable inference why the bequest was reduced; the beneficiary was then nine years younger, and not yet reared and educated; besides, testatrix probably knew her estate had been considerably depleted in subsequent years; but why she should cut off this beloved orphaned grandchild entirely, wholly change her mind in a few hours, if she did change it, and give practically the whole of the estate to the uncle, is without credible explanation, if we assume, as we must assume, that testatrix had testamentary capacity, and further, that in making her will she was not influenced by others.   If the will came into her hands about the 1st of February, 1900, she spoke not of it again until the morning of November 13 following, ten months afterwards; it was first seen by the son and then, as he testifies, her signature, "Letitia Robinson," was to it, but not witnessed; if that was her genuine signature, subscribing witnesses were not necessary; it would not be unusual ignorance for a layman not to know this; but to inform and aid her she had two lawyers, her son and Mr. Dickson, both of whom seemed to think it must be again subscribed by her in the presence of attesting witnesses, so she made her mark.   The son testifies that in the presence of Dickson he read parts of the will and explained others to her; Mr. Dickson does not so testify; he says positively that he knew nothing of the contents of the will until after her death, although, if it had been partly read and explained in his presence by the son, he must have wholly forgotten that fact; the man Thomas and May Disert, the nurse, largely corroborate the son's testimony.   In the will is a substantial provision for her son James, although he had been in his grave for eight months, a fact well known to her, for she helped make arrangements for his funeral, and about three months before her death had paid the expenses of his burial; yet this provision, which she must have known had become

ineffective, was permitted to remain unchanged. Taking the testimony in its most favorable aspect towards appellant, these facts are undisputed; the son is almost the sole beneficiary under the will, he knew her weakness as early as 1876, had for years managed all her affairs to his own large profit, had assisted and advised her in the preparation of her will, was the chief agent in the execution of it, was present and in unmistakable language made known his presence to her just as she was being propped up in bed to make her mark, then retired out of sight but not out of hearing, did not leave the will in her custody, but had it locked up in his office safe.

This, it is true, is only contestant's side of the case. The testimony of John B. Robinson contradicts it in some important particulars, and as to others which are calculated to arouse suspicion, he furnishes plausible and reasonable explanations. If the son had not been called at all as a witness, and the verdict on the whole issue had been against contestants, the law, which so rigidly watches the conduct of the chief beneficiary, who aids in the preparation and execution of a will, might have moved the court to set the verdict aside; yet with his testimony in full, if the jury had credited it, it is probable the verdict would have been the other way; in which event, it is doubtful if the court below would have disturbed it. But the jury seem to have discredited his testimony because of its inconsistency with that given at the preliminary hearing. As already noticed, testatrix made her will on the 13th of November, on the 23d she died, on the 12th of December, four weeks after the will was executed, the preliminary hearing was had; the son was then called as if on cross-examination and testified, that he had very little to do with the preparation of the will; that he had never seen it until the day it was executed; that he had, to adopt his own language, " Nothing at all to do with the construction of the will; " had never talked with his mother about the contents of the paper; that he thought his mother took the paper home with her to Media when she left Pittsburg. When it is remembered that at the trial a year after, he testifies, that his mother went to Pittsburg with him to prepare her will; that she in conference with him did prepare it in her room at the Monongahela House; that he took notes and had them typewritten, then left the typewritten copy with his mother after

some alteration in his own hand; that from this the will was made; that the copy was mailed to him by Motheral and Lea and after consultation with his mother and some alterations was remailed to Mr. Slack for the final copy, which was returned to his mother, the inconsistency of the two statements is so glaring, that the jury had reason to discredit him. His explanation is that the letters of Motheral and Lea, and their statements just before the trial, which he did not have before him at the preliminary hearing, brought to his mind facts which at the hearing he had wholly forgotten. But the sufficiency of this reason was for the jury and was clearly submitted to them by the court below.

We take the law to be as cited by appellant from Tawney v. Long, 76 Pa. 106, 115:

" Undue influence of that kind which will affect the provisions of a testament must be such as subjugates the mind of testatrix to the will of the person operating upon it; and in order to establish this proof must be made of some fraud practiced, some threats or misrepresentations made, some undue flattery, or some physical or moral coercion employed, so as to destroy the free agency of the testatrix, and these influences must be proved to have operated as a present constraint at the very time of making the will."

This statement of the law pointedly excludes the idea of undue influence on the evidence in that case; the sum of that evidence is thus stated by this court: " The testimony does not even raise the idea of solicitation, much less that of improper or fraudulent conduct on the part of Tawney. It contains but the advice one prudent and cautious neighbor might give to another under like circumstances."

In the same line is Yorke's Estate, 185 Pa. 61, only recently decided by us on an able opinion of Judge HANNA of the orphans' court of Philadelphia. This case, also cited and relied on by appellant, decides that:

" Where the testatrix is proved to possess full and entire testamentary capacity, even though to some extent enfeebled by the infirmities of age, and even though the will be prepared by a confidential friend and advisor who is benefited by the will and made executor, the presumption is in favor of the validity of the will, and that it is in accord with the voluntary and uncontrolled wish of the testatrix."

Notice, however, the undisputed facts in Yorke's case and see how far short they fall of those demanded by the law to establish undue influence and rebut the presumption in favor of the will. The testatrix was a maiden lady who had executed her will in her seventy-ninth year; this remained unaltered for seven years or until 1891; her niece and her niece's husband were her most intimate friends and companions; in that year, 1891, she concluded to add a codicil to her will; she sent for this nephew by marriage, a reputable lawyer, and informed him of her wish, and he prepared the codicil and left it with her; she then sent for her physician who brought with him another physician to witness it; they spent over an hour with her; they read to her the codicil and by questions satisfied themselves, she fully understood it; she then signed and they witnessed it; both testified, although she was then eighty-six years old that she was in good health mentally and physically; the nephew, the draughtsman of the codicil, was not present, nor was he in the house when it was executed; the day following she gave him the will which he by her instructions deposited with a trust company, subject to her order; although she lived two years afterwards, she made no change; the codicil gave about half an estate of $90,000 to her niece, the wife of the draughtsman, and $5,000 to him. The court held, that instead of the facts showing undue influence, they negatived that idea. And so with all the many cases cited by appellant; in not one of them, or of the many others that we have examined, does the proof approach in significance that in the case before us.

In Boyd v. Boyd, 66 Pa. 283, it was decided that, "general evidence of power over the testator, especially if he be of comparatively weak mind, from age or bodily infirmity, though not to such an extent as to destroy testamentary capacity, will be enough to raise a presumption which ought to be met and overcome before such a will can be established. Particularly, ought this to be the rule when the party to be benefited stands in a confidential relation with the testator."

Says 1 Redfield on Wills, * 515, " Where the party to be benefited by the will, has a controling agency in procuring its execution, it is universally regarded as a very suspicious circumstance, and one requiring the fullest explanation." This text of Judge REDFIELD has been adopted with approval, as the

law by this court in many cases. 27 Am. & Eng. Ency. of Law, 488, after citing very many cases on the subject of undue influence in dealings between parent and child, gives this as the result: "The courts generally regard such dealings as rather to be favored then condemned, as being one means of performing a parental duty. On the other hand, the courts will eagerly seize upon any circumstances tending to show imposition when proved and will give them due weight. Such a circumstance would be the great age of the parent or his failing health. As used in the law of wills undue influence has been defined, 'As that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist.' . . . . The influence necessary to destroy the free agency of the testator and substitute the will of another depends upon the strength of will of the testator. Each case will differ from every other one. As has been said, it is a relative thing always to be taken in the concrete. The question in each instance is, was the influence exerted, sufficient under the circumstances, to overcome the will of the particular testator, whose will is before the court?" Then when there is conflicting evidence, or evidence from which conflicting inferences may be drawn, the advantage which a jury has over an appellate court and the intelligent aid it may give in ascertaining the truth is aptly pointed out by Justice MITCHELL in Sharpless's Estate, 134 Pa. 250.

"Looking at the contestant's evidence separately, it seems to make a case for a jury; and if no counter evidence were there adduced, there would probably be no hesitation as to a verdict. So on the other hand it is equally clear that the proponent's evidence would not only support but uncontradicted would command a verdict. Does it, however, so completely meet, answer and overthrow the contestant's case as to leave but a one-sided issue? We cannot say so. Looking at the whole evidence as put before us in print, we do not think we can say, that the balance is not doubtful. So much depends on the means of knowledge, the interest or bias, the manner, the character, and the personal weight each witness carries as an individual among his neighbors and in the community, that a jury is the only appropriate tribunal to determine which way the balance inclines. Having the testimony present to their

eyes, as well as their ears, the truth may be made manifest beyond any substantial doubt."

Every word of this is pointedly applicable to the contradictory evidence before us.    Without a sweeping change in the evidence on the one side or the other, this case could not escape the scrutiny of a jury.

In our discussion thus far, we have passed in substance on all those assignments which allege error directly or indirectly in submitting the evidence to the jury; they are all overruled.

Assignments 519 and 568 complain at a considerable length of the inadequacy and misleading character of the charge of the court, in defining what constitutes undue influence.    In this class of cases it is always difficult for a court to adopt a succinct statement of the law which the jury can readily apply to the evidence before them.    As the law already quoted says: "Each case will differ from every other one.    Undue influence is a relative thing always to be taken in the concrete."    The learned trial judge enunciated the law in general as found in the books on the subject of undue influence; as was necessarily the case, much of it had no application to the particular evidence before him and therefore, would give no light to the jury in their deliberation upon it; but in view of what he said in the conclusion of his charge, the jury could not have been confused or misled; the learned judge said to them:

" I repeat, so that there shall be no mistake about it—as we have said to you a son may importune his mother to make a will in his favor, and counsel for plaintiffs has repeated various forms of appeal, which you heard, that he may make to her, to induce her to make a will in his favor.    That is true, he may do so, he has a perfect right to do it, and if the only effect was to move her affections or sense of duty, or judgment, he has a perfect right to do it.    But if these importunities were such as the testator hadn't the power to resist, and yielded for the sake of peace and quiet, or escaping from serious distress of mind, if they were carried to a degree by which the free play of testator's judgment, or discretion, or wishes were overcome, it is undue influence.    He can coax her, but he must not drive her, either by moral coercion or physical force."

By this instruction he could not, more emphatically or more concisely, have turned their attention from the subject of un-

due influence in the abstract and fixed it on the concrete as developed by the evidence before them. He stated nothing that was not the law on some state of facts, and pointedly stated what it was as applicable to these facts; no jury of average intelligence could have been misled, or have failed to see just what constituted undue influence in this particular case.

Thirty-five assignments, in substance, complain for error of the admission in evidence of declarations of testatrix. These declarations were not offered to controvert the facts of the execution of the will, nor to show that it was the outcome of duress or fraud not involving her mental condition. For such purpose they would have been inadmissible as the authorities cited by appellant decide. They were offered as tending to show the mental weakness of testatrix and that the will was procured by the undue influence of her son. Without other evidence they would not have been sufficient of themselves to make out contestant's case, but taken in connection with the other evidence all the authorities hold they were admissible: Boyd v. Eby, 8 Watts, 70; Rambler v. Tryon, 7 S. & R. 90; McTaggart v. Thompson, 14 Pa. 149; Norris v. Sheppard, 20 Pa. 477; Trost v. Dingler, 118 Pa. 259.

Next it is alleged for error that the declarations of John B. Robinson were permitted to go to the jury and consequently affected other legatees who had nothing to do with the preparation or execution of the will. Under this head appellants' counsel group 226 assignments of error, setting them out in the old form of a multiplication table. The authorities cited sustain their point, but the point is not framed to fairly cover the ruling of the court on the admission of the offer. In Nussear v. Arnold, 13 S. & R. 323, Clark v. Morrison, 25 Pa. 453, and other cases, it is held that the interest of devisees under a will are several and not joint, therefore, that the declarations of one against his codevisees are not admissible to affect their interests. But it will be noticed in these cases, that the declarations consisted in an opinion of the legatee as to the testamentary incapacity of the testator and for that purpose they were offered. In the first case cited, there was evidence that three women had combined to get the testator drunk and procure from him a will in their favor; that they had declared to him they were persons of virtue and good character. These declarations made in car-

rying out the conspiracy were admitted, but the declaration of one of them outside the scope of the conspiracy that "the testator was incapable of transacting business," was held inadmissible. Chief Justice TILGHMAN, in deciding the case, says: "We are now to establish a general principle to govern all cases of this kind." That general principle was, that the conduct and declarations of those procuring a will by unlawful means, tending to show their purpose, are evidence; the independent declarations of one as to testamentary incapacity are not. Here, the offer was not to prove declarations of incapacity, it was to prove a confidential relation between the chief beneficiary and testatrix, collusion between him and her agents to procure her to make a will; and by the course of business between them extending over years, the subserviency of a weak mind to stronger ones. The only independent declarations proven were those of John B. Robinson on the witness stand, that his mother was not weak but was entirely capable, and had knowledge of her affairs; these statements formed no part of contestant's offer and were not the subject of the court's ruling. The court, after most careful consideration, admitted the evidence of the business and confidential relations of the parties from long before, down to the date of the will, strictly confining it to the purpose offered. In this there was no error. Says Justice GIBSON in Patterson v. Patterson, 6 S. & R. 55, "In fact, the evidence of practice on the intellect of a weak man, is usually compounded of ingredients so various in their nature and remote in their consequence and connection, that the question of relevancy is often of very difficult solution. In such a case the court should lean in favor of admitting the evidence, to enable the jury to judge from a consideration of all the circumstances." The case before us does not to us seem even difficult of solution; if the evidence admitted were to be held incompetent, we can scarcely conceive of any case, short of actual physical duress, where undue influence could be proven. All the assignments of error under this caption are overruled.

Assignments 557 and 558 raise questions wholly barren of fruit to appellant. The court decided that there was a lawful execution of the writing by testatrix when she made her mark; he submitted to the jury to find whether the name "Letitia Robinson" was her genuine signature independent of the mark;

as before noticed, the verdict on both questions was for plaintiff. Whether the circumstances attending the execution of the will tended to show a weak condition of mind unduly influenced at the time by her confidential adviser and principal beneficiary, was for the jury on the fifth interrogatory. It was, in connection with all the other evidence, a circumstance which might show a lack of ability to resist a stronger will; but disassociated from that influence, the facts of testamentary capacity and execution of the will remained undisturbed; and this was not only what in substance the court charged, but plainly charged. Assume that the court's instructions, that the making of the mark was a due execution of the will, and the instructions submitting to them the genuineness of her signature, were inconsistent, still as the verdict on both points was in favor of the plaintiff, he, not being hurt thereby, has no ground of complaint. These assignments are also overruled.

We see nothing further in the assignments which requires special notice; they are all overruled. Through an unbroken line of decisions for a century, this court has not failed in unmistakable terms to express its aversion to groundless litigation of a will by disappointed legatees. Where, however, the evidence was of that character and significance which plainly demanded that a jury should answer, whether the will was that of testator or that of some other person, we have not hesitated to affirm a judgment against the will. The latter is what we do in this case.

Judgment affirmed.

Mr. Justice Mitchell, dissenting:

The assignments of error in this case are so numerous that they lose much of their weight. Many of them should in my opinion be sustained, for much irrelevant and wholly inadmissible evidence was permitted to be thrown into the case to the prejudice of the appellant. But it is not desirable to discuss these matters in detail here. I would reverse the judgment on the broad ground that there was no evidence on which the jury should have been permitted to set aside the will.

The contest before the jury, briefly stated, embraced three points, the execution of the will, the testamentary capacity of the testatrix, and undue influence by appellant. As to the

first two points the evidence was such that the judge directed a verdict for the will. This left for the jury only the question of undue influence. Upon this there was no evidence amounting to a scintilla that any undue influence, if any ever existed at all, operated at the time of the execution of the will. The instrument in its final form was prepared by counsel in Pittsburg, mailed directly to the testatrix, and next appears in the evidence when produced by the testatrix from her own custody. The brunt of the argument against the will amounts to no more than that it is unnatural and suspicious. Whether a will is unnatural in a moral or ethical sense which cuts off some descendants and favors others is a question of casuistry with which the law is not concerned. A will is unnatural in a legal sense only when it is contrary to what the testator under the admitted circumstances and with his known sentiments would have made, and it is only on that ground that the question is admissible at all, to wit: that it tends to show that what testatrix did was not from her own natural impulse but from coercion.

In this case there is no room for any such contention, for the testatrix in her will only continued what she had been doing for years, while in the possession of full mental and physical vigor, putting the appellant on the footing of her preferred child and favorite beneficiary.

That at times she was dissatisfied with the reduction of her income and its lavish expenditure, and expressed her intention to restrict her son's management, was not unnatural, but does not prove undue influence. She was a woman, as testified, of strong will, with counsel of her own, not to mention the intermeddling advice of other relatives and nominal friends, but she never displayed any desire to go beyond a little querulous faultfinding, a not uncommon entertainment of the indulgent parent.

Taking the definition of undue influence as expressed in the opinion of the court I find nothing in the evidence which comes anywhere near the required standard.